# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**ALEXANDER RICHARDSON**,

      Petitioner,

v.                                                                    Case No. 8:21-cv-43-WFJ-JSS

**SECRETARY, DEPTARTMENT**
**OF CORRECTIONS**,

      Respondent.

_____/

## <u>ORDER</u>

Before the Court is Alexander Richardson's ("Petitioner") Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Dkt. 1). Secretary, Florida Department of Corrections ("Respondent") has responded in opposition (Dkt. 9), and Petitioner has replied (Dkt. 14). Upon careful consideration, the Court finds an evidentiary hearing unnecessary and denies Petitioner any relief.

## BACKGROUND

The instant Petition challenges the legality of Petitioner's confinement by the State of Florida. Petitioner maintains that his second-degree murder conviction was a result of ineffective assistance of trial counsel and that he was improperly denied relief by the state postconviction court. Petitioner requests that this Court grant him an evidentiary hearing, and ultimately vacate his state conviction and sentence.

## I.    Factual History

Sometime between late 2012 and early 2013, Petitioner met Josephine Austria (sometimes referred to as "Keira" or "Nikki") on an online dating website. Dkt. 9-2 at 1431. The two bonded and, on February 28, 2013, Petitioner moved to Florida to live in Ms. Austria's home. *Id.* at 1432. They began exclusively dating a month later.

While living with Ms. Austria, Petitioner joined the United States Army Reserve. *Id.* at 1435. Petitioner completed military police training—demonstrating an exceptionally high proficiency with firearms—and was assigned to a reserve military police unit based in Ocala, Florida. *Id.* at 956–57. Petitioner's unit was scheduled for deployment to Afghanistan on May 8, 2014. *Id.* at 1443.

On February 25, 2014, approximately two and a half months before Petitioner's deployment, Ms. Austria sent her friend Laurie Miller a troubling message (the "Facebook Message"). *Id.* at 876. Ms. Miller read the Facebook Message at Petitioner's trial:

> Are you awake? This is Keira. I can't be in an abuse relationship, babe. [Petitioner] is going out of his mind. The alcohol is driving him crazy. Tonight he hit me in the head three times. I have big bumps on my scalp. I wanted to call the police, but he just pinned me down to the carpet. I now have rug burns to my elbows and bumps in my head. And there's two crying emojis. I can't call the police. He threatened to shoot me with his gun. He has three of them. Please block him from your [Facebook] now. Don't wait.

*Id.* at 870–71. Ms. Miller testified that she met Ms. Austria at a Starbucks the following evening and witnessed the injuries Ms. Austria complained of. *Id.* at 871–72. Notwithstanding, Petitioner and Ms. Austria continued to live together.

On April 19, 2014, less than one month before Petitioner's deployment, Petitioner and Ms. Austria hosted a birthday party for Ms. Austria's friend Marta Lock. *Id.* at 729. Both Petitioner and Ms. Austria were heavily drinking with their guests. *Id.* at 628–29. By the early morning hours of April 20, 2014, Ms. Austria had developed some level of alcohol poisoning and had grown ill. *Id.* at 630. Petitioner and Terry Hogston (another friend of Ms. Austria) consequently guided Ms. Austria to the restroom connected to the master bathroom. *Id.* at 630–31. Ms. Austria vomited before Ms. Hogston helped her into bed. *Id.* at 634.

Within a few minutes, Ms. Hogston was helping Ms. Austria back into the restroom by herself, as Petitioner had gone to make a hamburger. *Id.* at 634–35; 1477. Petitioner returned after Ms. Hogston called for him. *Id.* Ms. Hogston helped Ms. Austria back into bed and Petitioner laid down next to her. *Id.* at 636. Ms. Hogston, assuming Ms. Austria was safe in Petitioner's care, went home. *Id.* at 638.

At this point, few people remained at the party. *Id.* at 731. Ms. Lock was cleaning dishes in the kitchen when Petitioner allegedly came out of the master bedroom looking for an E-cigarette. *Id.* at 731–32. Petitioner presumably found what he was looking for and returned to the bedroom shortly thereafter. *Id.*

3

Within a few minutes, however, Petitioner returned. "I need your help[,]" he purportedly said, "Keira is on the bathroom floor bleeding." *Id.* at 732 (cleaned up). Ms. Lock rushed into the bathroom to find Ms. Austria face down in a pool of blood—Petitioner had shot her in the back of the head. *Id.* at 733; 1483. Ms. Lock and others attempted CPR and called 911, but it was too late. *Id.* at 733–35.

According to Petitioner, Ms. Austria had gotten back up to vomit for a third time. *Id.* at 1480. Petitioner followed Ms. Austria, hoping to assist her by holding her hair while she kneeled by the toilet. *Id.* at 1481. Not wanting to "fall asleep with [his] gun in [his] pocket," Petitioner decided to take the gun out and put it on a shelf adjacent to the toilet. *Id.* at 1482–83. "[I]t went off." *Id.* Petitioner instantly knew that it had hit Ms. Austria in the back of the head. *Id.* at 1483. He was allegedly "shocked" and "didn't know what to do." *Id.* at 1482.

After Petitioner informed Ms. Lock of what happened, he "just ran." *Id.* at 1485. Petitioner eventually made it to a nearby Circle K gas station and told the clerk to call the police. *Id.* at 785–86. Officer Anthony Mills arrived shortly thereafter and took Petitioner into custody. *Id.* at 841.

## II.    Procedural History

On April 25, 2014, a grand jury charged Petitioner with first-degree murder in case number 14-6515-CFANO. *Id.* at 10. Petitioner pled not guilty and prepared

for trial. The State gave notice of its intent to use *Williams* Rule evidence to prove the absence of accident, mistake, or inadvertence on March 20, 2015. *Id.* at 39–40.

On July 24, 2015, the state trial court held a *Williams* Rule hearing. *Id.* at 42. The State sought to introduce: (1) text messages between Petitioner and Ms. Austria; (2) cell phone video and audio recordings that Ms. Austria had taken of Petitioner; and (3) the Facebook Message. *Id.* at 42; 178. Petitioner opposed the introduction of these materials and the underlying information conveyed by them. *Id.* at 46. On September 8, 2015, the state trial court issued a thorough opinion finding that the State would be "permitted to present to the jury the text messages and the Facebook [M]essage for the purposes indicated, however, the state may not introduce in its case in chief the audio or video recording made of [Petitioner]." *Id.* at 193. The court also made clear that "the [S]tate may not dwell on [Petitioner's] prior acts and must avoid the needless presentation of cumulative evidence." *Id.*

Petitioner's jury trial began on November 2, 2015. *Id.* at 196. After five days of testimony from twenty-six witnesses, including Petitioner, the jury found Petitioner guilty of the lesser included offense of second-degree murder. *Id.* at 1739. Petitioner filed a motion for a new trial, *id.* at 1748, but it was denied. The state court subsequently sentenced Petitioner to 40 years' imprisonment.  *Id.* at 1797; 1805.

On February 10, 2016, Petitioner appealed. *Id.* at 1808. Petitioner argued that the state trial court erred by: (1) allowing the State to introduce the Facebook

Message; (2) allowing the State to introduce the text messages; (3) denying Petitioner's motion for judgment of acquittal; and (4) denying Petitioner's motion for a mistrial. *Id.* at 1811–57. On November 15, 2017, the state appellate court *per curiam* affirmed Petitioner's conviction. *See Richardson v. State*, 239 So. 3d 669 (Fla. 2nd DCA 2017).

On February 11, 2019, Petitioner filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. *Id.* at 1913. Petitioner raised eleven grounds for ineffective assistance of counsel. *Id.* at 1913–61. The state postconviction court summarily denied Petitioner's claims on September 11, 2019. *Id.* at 1979. Petitioner appealed, but the state appellate court *per curiam* affirmed. *See Richardson v. State*, 308 So. 3d 608 (Fla. 2nd DCA 2020).

On January 7, 2021, Petitioner timely filed the instant Petition for Writ of Habeas Corpus. Dkt. 1. Petitioner alleges eleven grounds of ineffective assistance of counsel: (I) trial counsel was ineffective for failing to seek an instruction explaining to the jury that voluntary intoxication could be considered when determining whether an unintentional shooting occurred; (II) trial counsel was ineffective for failing to question Petitioner about the incident preceding the Facebook Message at the *Williams* Rule hearing or, alternatively, for failing to introduce a text message sent by Ms. Austria after she had sent the Facebook Message; (III) trial counsel was ineffective for failing to object to the admission of collateral crime evidence that

exceeded the scope of the trial court's order; (IV) trial counsel was ineffective for failing to object to the *Williams* Rule instruction which allowed the jury to consider the prejudicial evidence for absence of mistake or accident; (V) trial counsel was ineffective for enhancing the credibility of state expert witness Matthew Noedel; (VI) trial counsel was ineffective for opening the door and eliciting additional testimony regarding *Williams* Rule matters; (VII) trial counsel was ineffective because, through his acts an omissions, the collateral crime evidence became a feature of Petitioner's trial; (VIII) trial counsel was ineffective for failing to seek a limiting instruction after each presentation of collateral crime evidence; (IX) trial counsel was ineffective for failing to elicit testimony from Petitioner that he previously had an unintentional shooting when he lived in Virginia; (X) trial counsel was ineffective for failing to object or failing to move for a mistrial due to improper comments by the State in closing arguments; and (XI) the cumulative effect of trial counsel's acts and omissions resulted in sufficient prejudice to warrant a new trial. *Id.* at 11–57. Petitioner requests an evidentiary hearing on these matters. *Id.* at 57.

## LEGAL STANDARDS

This petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998). The AEDPA "establishes a highly deferential standard for reviewing state court judgments." *Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 768 (11th

Cir. 2003). This type of review does not allow relief of a state court conviction on a claim "that was adjudicated on the merits in the State court proceedings" unless the state court's decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1288 (11th Cir. 2016) (quoting 28 U.S.C. § 2254(d)).

"Clearly established Federal law" means holdings of the U.S. Supreme Court "as of the time of the relevant state-court decision." *Id.* at 1288–89. "Contrary to" requires a state court conclusion "opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 1289 (citations omitted) (alterations in original). The "unreasonable application" clause applies only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (citation omitted) (alterations in original).

A state court's factual determination "is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Id.* (citation omitted). Indeed, "even if reasonable minds reviewing the record might disagree about the [fact] finding in question, on habeas review that does

not suffice to supersede the [state] trial court's determination." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (internal quotation omitted). Further, this standard applies even if the state court does not provide the reasoning behind its decision because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Sec'y for Dep't of Corr.,* 278 F.3d 1245, 1254 (11th Cir. 2002). Only if this Court determines that the state court's adjudication of Petitioner's claim was unreasonable under § 2254(d) must a *de novo* review of the record be undertaken. *See McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009).

## DISCUSSION

Counsel is ineffective under the Sixth Amendment if "(1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense such that petitioner was deprived of a fair trial." *Dill v. Allen*, 488 F.3d 1344, 1354 (11th Cir. 2007) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A petitioner claiming ineffective assistance of counsel carries the burden of establishing both prongs. *Strickland*, 466 U.S. at 687.

To establish deficient assistance under *Strickland*, a petitioner must demonstrate that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. The test is not "what the best lawyers" or "what most good lawyers would have done." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir.

1992). Rather, the question is "whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.*

To establish resulting prejudice under *Strickland*, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* If the petitioner fails to establish either of the *Strickland* prongs, his claim fails. *See Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1319 (11th Cir. 2005).

Notwithstanding the highly deferential standard posed by *Strickland*, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). In the habeas context, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citation and internal quotation marks omitted). "If there is 'any reasonable argument that counsel satisfied *Strickland's* deferential standard,' then a federal court may not disturb a state-court decision denying the claim." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014) (citation omitted).

"[I]t is a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding . . . [I]t is rarer still for merit to be found in a claim that challenges a strategic decision of counsel." *Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (internal citations omitted). A strategic decision by counsel is only subject to federal habeas review when it was so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102.

## I.   Ground I

In Ground I, Petitioner argues that trial counsel was ineffective for failing to have the jury informed that Petitioner's intoxication could be considered when determining whether an unintentional shooting occurred. Dkt. 1 at 11–12. Petitioner raised this argument in his motion for postconviction relief, Dkt. 9-2 at 1917, and the state postconviction court denied it. *Id.* at 1965–67. The state appellate court affirmed without opinion. *See Richardson*, 308 So. 3d 608 at *1.

In denying Ground I, the state postconviction court found the following:

[Petitioner] alleges his counsel was ineffective for failing to seek an instruction explaining to the jury that voluntary intoxication could be considered when determining whether an unintentional shooting occurred. [Petitioner] alleges that while voluntary intoxication cannot be used to show that he lacked the specific intent to kill, it clearly can be considered by the jury when determining whether [Petitioner's]

11

intoxication contributed to or caused a lack of motor skills that resulted in an unintentional discharge. [Petitioner] alleges that prior to trial, the State filed a motion in limine to prohibit defense counsel from relying on the voluntary intoxication defense and counsel agreed that he would not argue that voluntary intoxication was a defense to first or second-degree murder. However, [Petitioner] alleges that voluntary intoxication could be considered by the jury when determining whether [Petitioner's] motor skills and ability to handle a firearm were affected. [Petitioner] alleges that despite counsel's knowledge of this, he failed to ensure that they jury understood that it could consider the [Petitioner's] impairment for purposes of determining whether [his] handling of the firearm resulted in the unintentional discharge. [Petitioner] alleges that the State's closing argument that it did not matter that [Petitioner] was intoxicated when it comes to first and second-degree murder was a misstatement of the law and the special instruction was necessary for the jury's deliberations. [Petitioner] alleges that absent a special jury instruction, confidence in the outcome of the proceeding was undermined.

The Court finds that [Petitioner] has failed to demonstrate deficient performance or resulting prejudice by counsel's failure to request the trial court to instruct the jury that voluntary intoxication could be considered when determining whether an unintentional shooting occurred. The jury was properly instructed on what constitutes excusable homicide: "One, when the killing is committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent, or, two, when the killing occurs by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or, three, when the killing is committed by accident and misfortune resulting from a sudden combat, if a dangerous weapon is not used and the killing is not done in a cruel or unusual manner." The evidence presented did not meet at least the last two of these categories. Specifically, there was no evidence of any sudden and sufficient provocation (this was also alleged in the instant motion); and a dangerous weapon was indeed used (i.e., a firearm). The only other option would be that the "accident" occurred when [Petitioner] was exercising usual ordinary care. However, [Petitioner's] level of drunkenness severely undermines such an argument. Thus, an instruction that [Petitioner's] motor skills and ability to handle a firearm were affected by his intoxication level would have highlighted the

conflicting nature of such a defense with the elements of excusable homicide.

The trial court further correctly instructed the jury that premeditated murder requires that [Petitioner] had the conscious intent to kill and, second-degree murder does not require the State to prove [Petitioner] had the intent to cause death. In instructing the jury on voluntary intoxication, the trial court specifically indicated that such evidence may not be taken into consideration to show that [Petitioner] lacked the specific intent to commit any crime. The trial court tracked the language of the statute in instructing the jury that voluntary intoxication is not a defense to any crime. The Court sees no issue with the trial court's following of the language of the statutes and the standard jury instructions.

Furthermore, the Court finds that for the Court to have instructed the jury any further as [Petitioner] indicates in his motion with respect to voluntary intoxication it would not have had any effect on the outcome of the case. The defense's entire argument was that [Petitioner's] level of intoxication affected his motor skills in such a way that he was exercising usual ordinary caution but that his finger or grip apparently made the firearm go off when he was attempting to put it up on the shelf. The defense put on an expert to testify that [Petitioner's] blood alcohol level was around .22 at the time the gun discharged and that alcohol affects motor skills. Thus, counsel's vehement argument was consistently reiterated to the jury and a special instruction would have provided no further assistance to the jury. However, the safety features and mechanisms on the firearm in combination with the location of the wound (almost execution style) tending to contradict [Petitioner's] theory of defense (in addition to [Petitioner's] own testimony that he somehow recalled everything that happened before and after the shooting in detail but does not remember how the shooting occurred), the Court does not believe that the jury would have returned any different a verdict had the special instruction been given. Having found that the record refutes [Petitioner's] allegations of deficient performance and prejudice as to a special instruction on voluntary intoxication, this Ground is denied.

Dkt. 9-2 at 1965–67 (internal citations omitted).

This ruling was neither contrary to the record, nor a misapplication of federal law. To establish deficient performance as to Ground I, Petitioner must demonstrate that no "reasonable lawyer at the trial" could have failed to seek an instruction explaining to the jury that Petitioner's voluntary intoxication could be considered in determining whether an unintentional shooting occurred. *See Singletary*, 972 F.2d at 1220. The state postconviction court reasonably explained (based on an extensive review of the record) why Petitioner failed to carry this burden. To begin with, seeking such an instruction would have diminished any chance Petitioner had in succeeding on an excusable homicide defense by having the trial court itself highlight the likelihood that Petitioner was negligent when he shot Ms. Austria in the back of the head. While the Court understands that trial counsel focused on Petitioner's intoxication throughout the trial, it was not unreasonable to avoid unnecessary reiteration of this fact during the instruction phase where the standard jury instructions presented the jury with the option to convict Petitioner of culpably negligent manslaughter. Dkt. 9-2 at 1563–65. Under these circumstances, some reasonable lawyer could have determined that such a juxtaposition of instructions might destroy the possibility of a not guilty verdict due to "accident." It is also worth noting that the special instructions in question here would have added nothing of import to the jury's deliberations. The trial court's standard instructions merely informed the jury that evidence of voluntary intoxication may not be taken into

consideration to show that Petitioner lacked the *specific intent* to commit any crime. They in no way suggested that voluntary intoxication could not be considered in relation to whether Petitioner pulled the trigger of his gun by sheer physical accident. Counsel cannot be deemed ineffective for failing to request unnecessary instructions.

The postconviction court's prejudice finding is equally reasonable and supported by the record. As the postconviction court explained, a significant portion of the evidence presented at trial refuted the notion that Ms. Austria's death was an accident. Petitioner was trained in the use of firearms and deemed an expert in their use by the United States Army. *Id.* at 957. The Smith and Wesson .380 that Petitioner shot Ms. Austria with commonly requires a "deliberate" and "continuous" trigger pull due to its approximately ten pound trigger weight. *Id.* at 1137. The location of the entry and exit wounds in Ms. Austria's head made it unlikely that Petitioner accidently discharged his gun while attempting to place it on the shelf he claimed to have been placing it on at the time of the shooting. *Id.* at 1183–84. Given all of this, the Court cannot deem the postconviction court unreasonable for determining that the jury would have reached a second-degree murder verdict even if Petitioner had received special jury instructions concerning involuntary intoxication. *See Mirzayance*, 556 U.S. at 123 (finding that, under the AEDPA "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable").

Petitioner has failed to demonstrate any probability that additional instructions would have changed the outcome of his trial—Petitioner is entitled to no relief on Ground I. *See Strickland*, 466 U.S. at 694.

## II.    Ground II

In Ground II, Petitioner argues that trial counsel was ineffective for failing to (1) question Petitioner at the *Williams* Rule hearing about the incident preceding the Facebook Message and (2) introduce a certain text message sent by Ms. Austria after she sent the Facebook Message. Dkt. 1 at 17. Petitioner raised this argument in his motion for postconviction relief, Dkt. 9-2 at 1923, and the state postconviction court denied it. *Id.* at 1967–70. The state appellate court affirmed without opinion. *See Richardson*, 308 So. 3d 608 at *1.

In considering this claim, the state postconviction court found the following:

[Petitioner] alleges his counsel was ineffective for failing to question [Petitioner] about the incident preceding the Facebook [M]essage at the *Williams* Rule hearing and/or for failing to introduce a text message sent by [Ms. Austria] at 2:35 a.m. (ten minutes after the Facebook [M]essage). [Petitioner] alleges that his testimony was critical to this motion and would have established an earlier time that the incident occurred, thereby excluding the evidence as hearsay outside of the spontaneous statement and excited utterance exceptions. [Petitioner] alleges that the incident took place at approximately 12:45 a.m., about an hour and a half prior to the Facebook [M]essage being sent. [Petitioner] alleges that the incident began after [Ms. Austria] learned that [Petitioner] was conversing with Laurie Miller on Facebook, [Ms. Austria] became enraged and smashed [Petitioner's] laptop on the ground. [Petitioner] alleges that he would have testified to this at the hearing; however, counsel failed to ask any questions regarding this incident, such as when it occurred. [Petitioner] alleges that the trial

16

court admitted the Facebook [M]essage of 2:25 a.m. because the language of the message demonstrated that it occurred immediately after the incident. [Petitioner] alleges that a text message sent by [Ms. Austria] at 2:35 a.m. regarding an email address and password would also demonstrate reflective thought, calmness, and would have been further evidence that the incident did not happen at the time believed by the trial court. [Petitioner] alleges that had he been asked about the timeframe, there is a reasonable probability that the trial court would have excluded the harmful testimony. He contends that confidence in the outcome of the hearing and the trial have been undermined.

At the hearing on the Facebook [M]essage, it is clear from the record that counsel chose not to question [Petitioner] regarding the incident prompting the Facebook [M]essage because then [Petitioner] would be admitting to prior domestic violence against [Ms. Austria]; and, the defense was seeking to exclude all evidence of a volatile relationship. It would have only confirmed the domestic violence situation had [Petitioner] testified as he says he wished to at the *Williams* Rule hearing. The State sought to introduce the prior domestic violence to prove premeditation/intent and lack of mistake/accident. Counsel attempted to first exclude any reference to prior domestic violence by [Petitioner]. Then, after the trial court allowed the *Williams* Rule evidence, counsel had [Petitioner] better explain such evidence at trial. The Court finds the trial strategy that counsel attempted to exclude all reference and admission to domestic violence prior to trial (as is evident from the record) to be sound strategy in this case.

[Petitioner's] trial testimony does not give any clearer a picture as to the time the incident occurred in relation to when the Facebook [M]essage was sent to Ms. Miller. It is clear, however, from [Petitioner's] trial testimony that the incident occurred the same evening as that the Facebook [M]essage was sent. Additionally, Ms. Miller saw and felt [Ms. Austria's] injuries (consistent with the Facebook [M]essage) the following day. If [Petitioner] was unable to provide a time frame at trial, his allegation that he would have been able to provide an accurate timeframe at the *Williams* Rule hearing is specious.

The Court sees no relevance as to [Petitioner's] allegations regarding a text message allegedly sent by [Ms. Austria] at 2:35, ten minutes after

the Facebook [M]essage. [Petitioner] merely avers that the text message is "regarding an email address and password" and would demonstrate reflective thought and calmness. [Petitioner] does not indicate to whom the text message was sent or how it would demonstrate reflective thought and calmness ten minutes prior. It is pure speculation as to what the text message would have provided in relation to the Facebook [M]essage.

Counsel argued vehemently at the *Williams* Rule hearing that the Facebook [M]essage did not constitute any exception to the hearsay exclusionary rule. Counsel even reminded the trial court that it was the offering party that has the burden of demonstrating no reflective thought. Without a definite time of when the incident occurred, this would prove more difficult than if [Petitioner] had testified that the incident occurred at 'approximately' 12:45, permitting the State to argue that such an attack had a lasting impact on [Ms. Austria] that an hour and a half later [Ms. Austria] was still under the stress of excitement caused by the event and had no time for reflective thought before sending the message. Nonetheless, the trial court found that the Facebook [M]essage constituted a spontaneous statement and even pointed out that while the violence occurred earlier in the evening, [Ms. Austria] was still under threats and unable to call for help when she sent the message. This finding would have also occurred even if [Petitioner] had testified that the incident occurred at 'approximately' 12:45 because the message was typed in the present tense and the "incident" was really a series of beatings and pinning [Ms. Austria] to the ground (and a threat to shoot her), which could have last well beyond 12:45 until the message was sent at 2:25.

Moreover, the trial court found that the Facebook [M]essage did not constitute hearsay because it was not being offered to prove the truth of the matter asserted within the statements; rather, the purpose of the message was to prove intent and premeditation and to rebut the defense of accident or mistake. Thus, [Petitioner's] purported testimony that the incident occurred at 12:45 ultimately would have had no bearing on the admissibility of the Facebook [M]essage. Additionally, the Court would point out that even after the trial court's ruling, counsel attempted to again exclude the Facebook [M]essage by filing a motion in limine and also renewed its objection when this evidence was presented at trial. The Court finds that counsel was not deficient at this hearing for

failing to have [Petitioner] testify as to the time the February 24 incident occurred notwithstanding the fact that the hearing did not go in the defense's favor. Even if counsel was deficient, [Petitioner] was not prejudiced in light of the trial court's finding that the evidence did not constitute hearsay and was therefore admissible relevant evidence. Ground [II] is denied.

Dkt. 9-2 at 1967–70 (cleaned up) (internal citations omitted).

The postconviction court's finding is more than reasonable enough to prevent this Court from disturbing it. *See Hittson*, 759 F.3d at 1248 (finding that, "[i]f there is 'any reasonable argument that counsel satisfied *Strickland's* deferential standard,' then a federal court may not disturb a state-court decision denying the claim.") (citation omitted). Ground II is predicated on the notion that the Facebook Message was admitted solely on hearsay exception grounds. Dkt. 1 at 18. Petitioner argues that the introduction of his testimony concerning preceding events and a text message following the Facebook Message would have rendered the hearsay exceptions inapplicable and therefore kept the Facebook Message from being admitted following the *Williams* Rule hearing. As the postconviction court explained, however, the trial court found that the Facebook Message was also non-hearsay because it was not being offered to prove the truth of the matter asserted. *See* Dkt. 9-2 at 192 (the trial court finding that the Facebook Message "is offered to prove intent and to rebut the argument of accident or mistake. As such, the Facebook [M]essage is non-hearsay and may serve as similar face evidence."). It follows that Petitioner could not have been prejudiced by counsel's failure to present additional

testimony or text messages at the *Williams* Rule hearing. The Facebook Message would have been admitted regardless.

The Court also agrees with the postconviction court concerning Petitioner's failure to demonstrate deficient performance. The ultimate purpose of Petitioner's opposition to *Williams* Rule evidence in the pre-trial phase was to prevent the introduction of any evidence tending to show the existence of a volatile relationship between Petitioner and Ms. Austria. Petitioner's purported testimony—that the two were fighting prior to the Facebook Message—would have potentiality created more evidence of a volatile relationship while doing little to nothing to prevent the Facebook Message from being admitted at trial. It is important to recognize that a strategic decision by counsel is subject to federal habeas review only when it was so "patently unreasonable that no competent attorney would have chosen it." *Wainwright*, 709 F.2d at 1445. Many competent attorneys would have chosen not to present potentially harmful testimony during the pre-trial phase that could undercut their defense later on. Trial counsel was not deficient, and Petitioner was not prejudiced. He is entitled to no relief on Ground II.

## III.   Ground III

In Ground III, Petitioner argues that trial counsel was ineffective for failing to object to admission of *Williams* Rule evidence at trial that exceeded the scope of the trial court's order. Dkt. 1 at 22. Petitioner raised this argument in his motion for

postconviction relief, Dkt. 9-2 at 1928, and the state postconviction court denied it.

*Id.* at 1970–71. The state appellate court affirmed without opinion. *See Richardson*,

308 So. 3d 608 at *1.

    In denying this claim, the postconviction court found the following:

[Petitioner] alleges his counsel was ineffective for failing to object to the admission of collateral crime evidence that exceeded the scope of the trial court's order. More specifically, [Petitioner] alleges that additional evidence was presented regarding the Facebook [M]essage incident that exceeded the permissible scope set forth in the trial court's order, which he alleges only allowed specific *Williams* Rule evidence to be admitted at trial. [Petitioner] alleges that the State filed its notice of intention to introduce *Williams* Rule evidence for the sole purpose of introducing 1) audio and video recordings of [Petitioner] on his phone, 2) the Facebook [M]essage sent by [Ms. Austria] to Laurie Miller, and 3) text messages between [Ms. Austria] and [Petitioner]. [Petitioner] alleges that the trial court's order only permitted the admission of the Facebook [M]essage and the text messages, and not collateral testimony about the incident. [Petitioner] alleges that despite this specific order, the State asked questions of Laurie Miller about the incident, to which counsel failed to object. Specifically, [Petitioner] takes issue with the line of questioning of Laurie Miller regarding her conversation with [Ms. Austria] and the injuries she observed at Starbucks. [Petitioner] contends counsel should have filed a motion in limine to prevent the presentation of additional or cumulative collateral crime evidence. [Petitioner] alleges that counsel's failure to object undermined confidence in the proceeding.

The Court finds this claim to be without merit. The trial court's order permitted the presentation of the Facebook [M]essage for the purpose of demonstrating the context in which the crime occurred, i.e., that the victim and [Petitioner] had a turbulent violent relationship. The Court found the prior acts to be relevant and the specific evidence of the Facebook [M]essage to be admissible. The Court finds that Ms. Miller's testimony confirming that she saw injuries consistent with the contents of the Facebook [M]essage does not exceed the scope of the trial court's order, nor would any objection on such a basis been sustained. The

testimony of Ms. Miller was brief and only focused on the contents of the Facebook [M]essage. Additionally, the defense renewed its objection to the evidence at trial. If counsel had filed a motion in limine to exclude the testimony of Ms. Miller that she saw injuries consistent with the Facebook [M]essage, such a motion would have been denied because it would be admissible relevant evidence of the volatile relationship and went directly to the contents of the Facebook [M]essage. Counsel cannot be deemed ineffective for failing to make a meritless objection or file a meritless motion. Therefore, Ground [III] is denied.

Dkt. 9-2 at 1970–71 (cleaned up) (internal citations omitted).

The Court will not overturn this state-law based denial of Ground III. It is well established that "state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters." *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997) (citation omitted). Further, "[a]lthough an ineffective-assistance-of-counsel claim is a federal claim, which we consider in light of the clearly established rules of *Strickland*, when the validity of the claim . . . is clearly a question of state law . . . we must defer to the state's construction of its own law." *Will v. Sec'y For Dep't of Corr.*, 278 F. App'x 902, 908 (11th Cir. 2008) (internal quotations and citations omitted). Here, the validity of Ground III turns on Florida's Rules of Evidence and the state caselaw cited by Petitioner interpreting those rules. The state postconviction court ruled that any objection or motion in limine concerning Ms. Miller's limited testimony would have been meritless. The postconviction court consequently determined that counsel was not deficient for failing to object or move in limine, and that Petitioner was not prejudiced.

Reexamination of these state-law based determinations are beyond the Court's function on habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 63 (1991) (finding that it was "improper for [a federal court] to base its holding on its conclusion that the evidence was incorrectly admitted under state law, since it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Petitioner is entitled to no relief.

## IV.   Ground IV

In Ground IV, Petitioner argues that counsel was ineffective for failing to object to the *Williams* Rule instruction which allowed the jury to consider prejudicial evidence for absence of mistake or accident. Dkt. 1 at 27. Petitioner raised this argument in his motion for postconviction relief, Dkt. 9-2 at 1946, and the state postconviction court denied it. *Id.* at 1974–75. The state appellate court affirmed without opinion. *See Richardson*, 308 So. 3d 608 at *1.

The state postconviction court denied this claim under the following reasoning:

> [Petitioner] alleges his counsel was ineffective for failing to object to the *Williams* Rule instruction, which advised the jury that they could consider the *Williams* Rule evidence for multiple purposes, including the absence of mistake or accident. [Petitioner] contends that counsel should have removed this language because the *Williams* Rule evidence was not "strikingly similar" to the charged offense, which is required in order to be considered for this purpose. [Petitioner] alleges that this prejudiced him because it went to the very crux of his defense — that it was an unintentional shooting. [Petitioner] alleges that had counsel objected, this language would have been removed, the State could not

have relied on that portion of the instruction, and confidence in the outcome of the proceeding would not have been undermined.

This ground is without merit and refuted by the record. The State filed a pre-trial notice of intent, and a hearing was held on the notice, after which the trial court had made such finding that the *Williams* Rule evidence could come in for the purpose of demonstrating absence of mistake or accident. The *Robertson v. State*, 829 So. 2d 901, 908 (Fla. 2002) case cited by [Petitioner] is inapplicable here because in *Robertson*, the State introduced *Williams* Rule evidence without going through the proper procedures outlined in section 90…402(2)(b), Florida Statutes, which includes notice prior to trial. Additionally, the *Robertson* court found that because the victim Robertson previously threatened to shoot and the victim that was in fact shot in that case were different, [the subject evidence] would not support a finding of similar fact evidence.

Here, the *Williams* Rule evidence was indeed strikingly similar. [Petitioner] had previously gotten drunk and attacked [Ms. Austria], including threatening to shoot [her]. . . . The Court finds that counsel was not deficient for failing to object to the *Williams* Rule instruction because such an objection would have been overruled. Counsel cannot be deemed ineffective for failing to make a meritless objection. Ground [IV] is denied.

Dkt. 9-2 at 1974–75 (cleaned up) (internal citations omitted).

For the reasons expressed above, the Court cannot second-guess this ruling.

Ground IV is clearly based on the underlying state law issue of whether the *Williams* Rule evidence presented in Petitioner's case was "strikingly similar" to the charged offense under Florida caselaw. *See* Dkt. 1 at 28 (Petitioner arguing that "Florida courts have repeatedly recognized that *Williams* Rule evidence admitted for the purpose of demonstrating absence of mistake or accident must be substantially or 'strikingly' similar in order for the evidence to be admissible"). The postconviction

court found that, thereunder, "the *Williams* Rule evidence [presented at Petitioner's trial] was indeed strikingly similar [to the charged offense]." Dkt. 9-2 at 1975. Accordingly, "counsel was not deficient for failing to object . . . because such an objection would have been overruled." *Id.* It is not this Court's prerogative to reexamine state court rulings on issues of state law. *See Estelle v. McGuire*, 502 U.S. at 63. Petitioner is entitled to no relief on Ground IV.

## V.    Ground V

In Ground V, Petitioner argues that counsel was ineffective for enhancing the credibility of state expert witness Matthew Noedel during closing arguments. Dkt. 1 at 30. Petitioner raised this argument in his motion for postconviction relief, Dkt. 9-2 at 1949, and the state postconviction court denied it. *Id.* at 1976–77. The state appellate court affirmed without opinion. *See Richardson*, 308 So. 3d 608 at *1.

In considering this claim, the postconviction court found the following:

> [Petitioner] alleges his counsel was ineffective for enhancing or vouching for the credibility of State expert witness Matthew Noedel. [Petitioner] alleges that Mr. Noedel reconstructed the crime scene and testified about numerous matters related to firearms. [Petitioner] alleges that during closing argument, counsel informed the jury that Mr. Noedel was a 'supreme expert' in his knowledge of guns and reconstructing the scene. [Petitioner] alleges that counsel failed to realize that Mr. Noedel provided very damaging testimony and by highlighting his expertise, counsel made certain that the jury viewed Mr. Noedel as a supreme expert. [Petitioner] alleges that while Mr. Noedel testified that even experienced people who were well-trained could have an unintentional discharge, he also testified that a person who was given military police type training was less likely to have an unintentional discharge and, that a "long trigger pull is meant to give

the operator an option of deciding to not continue to pull the trigger without having to discharge the gun." [Petitioner] alleges that [he] was given military police training and was thus less likely to have an unintentional discharge according to this supreme expert. Additionally, the gun used in this incident had a long trigger pull, thereby further undermining [Petitioner's] theory of an unintentional shooting. [Petitioner] alleges that bolstering the expert's credibility was prejudicial because the expert's testimony was damaging to [Petitioner's] theory of defense, i.e., an unintentional discharge. [Petitioner] contends that this undermined confidence in the proceeding.

After reviewing this one excerpt of closing argument in the entire context of the closing argument, the Court finds that counsel's reference to Mr. Noedel as a "supreme expert" to not be ineffective assistance of counsel. Counsel went through the testimony of the lay witnesses and noted that not a lot of facts were in dispute amongst those witnesses; counsel also gave argument for why [Petitioner] left the scene and explained why his actions demonstrate that this incident was an accident. Getting into the blood expert and the firearm expert, counsel pointed out that while their testimonies were intelligently relayed, their testimonies were not necessarily helpful to a finding of an intentional shooting. Counsel did state that Mr. Noedel was a "supreme expert" but, counsel put it into context that Mr. Noedel was merely reconstructing the scene, did not provide an opinion as to the manner of death, and no one knows for sure which way [Ms. Austria's] head was tilted based on the strike mark. Counsel attempted to place the State's "expert" as a knowledgeable individual who still could not definitively opine that the death was intentional. The Court finds counsel was not deficient nor was [Petitioner] prejudiced. Ground [V] is denied.

Dkt. 9-2 at 1976–77 (cleaned up) (internal citations omitted).

This ruling involved neither an unreasonable determination of the facts nor an unreasonable application of federal law. As the postconviction court explained, the full context of counsel's closing arguments demonstrates that counsel bolstered Mr.

Noedel's expertise for a strategic reason; that is, to persuade the jury to view Mr. Noedel "as everyone's expert" for the limited purpose of determining whether there was reasonable doubt surrounding the issue of intent. Dkt. 9-2 at 2227. The Court cannot deem this strategy unreasonable merely because it did not win the day. To be sure, the circumstantial evidence presented against Petitioner was substantial. And, given this, many competent attorneys might have attempted to recast some part of Mr. Noedel's testimony in Petitioner's favor to further elicit a reasonable doubt in the jurors' minds. Counsel's strategy was therefore not so "patently unreasonable that no competent attorney would have chosen it." *Wainwright*, 709 F.2d at 1445 (11th Cir. 1983).

It is also worth noting that Petitioner presents no persuasive reason to believe that counsel's comment as to Mr. Noedel changed the outcome of the trial. Petitioner argues that he was prejudiced because counsel's strategy may have indirectly bolstered Mr. Noedel's testimony that (1) a person trained in firearms is less likely to have an unintentional discharge of a firearm and (2) a long trigger pull can give a gun operator the option of deciding to not continue a trigger pull without discharging the gun. Dkt. 1 at 32. Both points of testimony are fairly obvious. In sum, Petitioner has failed to demonstrate a "reasonable probability that, but for counsel's [strategic description of Mr. Noedel], the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Petitioner is entitled to no relief on Ground V.

27

## VI.   Ground VI

In Ground VI, Petitioner argues that counsel was ineffective for opening the door and eliciting additional testimony concerning *Williams* Rule matters. Dkt. 1 at 35. Petitioner raised this argument in his motion for postconviction relief, Dkt. 9-2 at 1933, and the state postconviction court denied it. *Id.* at 1971–73. The state appellate court affirmed without opinion. *See Richardson*, 308 So. 3d 608 at *1.

In denying this claim, the state postconviction court found the following:

> [Petitioner] alleges his counsel was ineffective for opening the door and eliciting additional testimony regarding *Williams* Rule evidence, which has undermined confidence in the proceeding. [Petitioner] alleges that this initially occurred during the testimony of Terry Hogston. Specifically, [Petitioner] alleges that while the State did not ask this witness any questions about the nature of the relationship, counsel elicited harmful testimony on cross-examination that [Petitioner] was possessive of [Ms. Austria] — testimony that [Petitioner] alleges would not have otherwise been elicited. [Petitioner] alleges that once the door was opened, the State quickly seized the opportunity and presented the jury with additional prejudicial testimony regarding [Petitioner], who was described as "very possessive," by this witness on re-direct. [Petitioner] alleges that this then prompted the jury to ask additional questions regarding [Petitioner's] possessive relationship. [Petitioner] alleges that counsel attempted to exclude the question posed by a juror but the trial court ruled that counsel opened the door and allowed the jury to hear that [Petitioner] went everywhere with [Ms. Austria] and did not allow her to hang out with her girlfriends without him. [Petitioner] alleges that such testimony was prejudicial because it demonstrated that [Petitioner's] possessiveness was the catalyst for the fight and for the shooting (in light of the evidence that [Petitioner] was angry with the victim prior to the shooting because Michelle Williams was going to move in with [Ms. Austria]).
>
> Additionally, [Petitioner] alleges that during his own testimony, the State would not have been able to cross-examine him regarding the

contents of the Facebook [M]essage or the text messages unless he testified about them or otherwise opened the door. [Petitioner] alleges that counsel asked questions in attempt to explain the incident that was related to the Facebook [M]essage and the text messages, which opened the door to the State asking about the incident, the Facebook [M]essage, text messages, and additional bad acts, to which counsel did not object. [Petitioner] alleges that if counsel's strategy was to make [Petitioner] look credible by discussing the matters, the execution of that strategy was flawed because [Petitioner] did not acknowledge the full extent of his purported conduct set forth in the Facebook [M]essage, thereby having the opposite effect and making him look not credible.

On cross-examination of Terry Hogston, counsel asked, "And you'd characterize their relationship as a very loving relationship; isn't that true?" Counsel asked a yes or no question; however, the witness took liberty in answering to explain, "I said it was loving on the outside. However, it was possessive." Counsel then followed up with, "But you described it as loving, correct?" The witness responded, "I said it appeared to be, yes." Then the questioning moved on. It does not appear that counsel anticipated Ms. Hogston to answer that [Petitioner] was possessive and once she did, counsel tried to focus on the "loving" characterization and moved on. Indeed, counsel indicated that Ms. Hogston had previously testified, likely during deposition, that she had characterized the relationship as loving. On re-direct by the State, the State did bring this back up and asked if it appeared that [Petitioner] was jealous and possessive to which the witness responded, "Very possessive, yes." Ms. Hogston also then stated that she was not aware of any prior violence. When the jury asked the question: what do you mean by possessive relationship, Ms. Hogston responded that [Petitioner] was constantly by [Ms. Austria's] side and [Ms. Austria] would not go out with her girlfriends without [Petitioner]. Noting that counsel did not anticipate this answer in light of this witness's previous testimony, this is akin to a hindsight analysis. The Court is not prepared to find counsel deficient in this instance. Nevertheless, even if it were deficient, the Court does not find that [Petitioner] was prejudiced by this. Possessive and violent are two separate and distinct characteristics. Ms. Hogston testified that she never witnessed any violence, and her definition of possessive was that [Petitioner] was with [Ms. Austria] constantly. In light of the other evidence and the facts of this case (shooting the victim execution style, being a highly trained in firearms,

and conveniently not remembering the incident while recalling every other detail of the evening), the Court finds that characterizing [Petitioner] as possessive does not undermine the Court's confidence in the outcome of this trial.

[Petitioner's] argument as to counsel's questioning of him regarding the Facebook [M]essage and text messages, which allowed questioning on cross-examination on the issue is essentially hindsight analysis, which is not permitted in a motion for postconviction relief. Once the Facebook [M]essage and text messages were allowed in for the purpose of demonstrating intent and lack of mistake, it was incumbent upon defense counsel to show the full context of the Facebook [M]essage and text messages in order to show that [Petitioner] was not always the aggressor in the supposedly volatile relationship. This was reasonable trial strategy (evident from the record) in light of the trial court's ruling that such evidence was allowed. [Petitioner's] own failure to acknowledge the full extent of the incident leading to the Facebook [M]essage should not be imputed to counsel for purposes of finding counsel deficient. That the State was effective in cross-examining [Petitioner] on the issue is unfortunate; however, it would not have been apparent to counsel without the benefit of hindsight. And; as stated in the preceding paragraph, the evidence of guilt presented at trial does not undermine this Court's confidence in the outcome of the trial. Thus, [Petitioner] has failed to demonstrate prejudice. Ground [VI] is denied.

Dkt. 9-2 at 1971–73 (cleaned up) (internal citations omitted).

The Court finds that this ruling involves an unreasonable determination of the facts as they relate to whether counsel should have anticipated Ms. Hogston's testimony. While "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight[,]" *Strickland*, 466 U.S. at 689, hindsight was not required to foresee the testimony that counsel's questioning would elicit from Ms. Hogston. Indeed, at the time counsel cross-examined Ms. Hogston, he had every reason to believe that she would testify as she previously had

in her initial deposition. At her deposition, Ms. Hogston claimed that Petitioner and Ms. Austria "appeared to be very loving to each other" but that "[Petitioner] was possessive in the way that, I mean, he was constantly by her side." Dkt. 9-2 at 18. Ms. Hogston's testimony at trial was essentially identical. It follows that counsel should have anticipated opening the door to further negative testimony on re-direct.

Notwithstanding, the Court agrees that Petitioner was not prejudiced under *Strickland* by any of Ms. Hogston's testimony. To demonstrate prejudice, Petitioner "must show that there is a reasonable probability that," but for the additional testimony counsel opened the door to, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner cannot do this. As the postconviction court explained, Ms. Hogston merely stated (on cross-examination, re-direct, and in response to the question from the jury) that Petitioner was possessive because he was always with Ms. Austria and Ms. Austria would not go out without him. But Ms. Hogston also testified that she was aware of no violence between Petitioner and Ms. Austria and that their relationship appeared loving. Given this and the other evidence presented at trial tending to demonstrate a volatile relationship and an execution style murder, the postconviction court determined insufficient the probability that Ms. Hogston's testimony changed the result of the proceeding. This was a reasonable determination that the court will not disturb. *See Mirzayance*, 556 U.S. at 123 ("[t]he question is not whether a federal court believes

the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

Petitioner's claim concerning counsel's questioning of him, on the other hand, fails on both *Strickland* prongs. "[A]ccount[ing] for the variety of circumstances faced by defense counsel," *Strickland*, 466 U.S. at 689, the postconviction court determined that "it was incumbent upon defense counsel to show the full context of the Facebook [M]essage and text messages in order to show that [Petitioner] was not always the aggressor in the supposedly volatile relationship". Dkt. 9-2 at 1973 (cleaned up). This is a reasonable finding regardless of the State's effectiveness on cross-examination because counsel's "strategy choice was well within the range of professionally reasonable judgments." *Strickland*, 466 U.S. at 699.  The test, after all, is not "what the best lawyers" or "what most good lawyers would have done[,]" but rather "whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Singletary*, 972 F.2d at 1220. Many reasonable lawyers would have attempted to provide full context to damaging *Williams* Rule evidence. Counsel, furthermore, cannot be said to have carried out this strategy deficiently simply because Petitioner failed to acknowledge the full context when given the opportunity to do so. Petitioner is entitled to no relief on Ground VI.

## VII.   Ground VII

In Ground VII, Petitioner argues that counsel was ineffective because, through his acts and omissions, collateral crime evidence became a feature of the trial. Dkt. 1 at 43. Petitioner raised this argument in his motion for postconviction relief, Dkt. 9-2 at 1943, and the state postconviction court denied it. *Id.* at 1973–74. The state appellate court affirmed without opinion. *See Richardson*, 308 So. 3d 608 at *1.

In denying this claim, the postconviction court found the following:

[Petitioner] alleges his counsel was ineffective for causing or allowing the collateral crime evidence to become a feature of the trial. [Petitioner] alleges that the jury repeatedly heard evidence that he physically abused [Ms. Austria], that he was possessive, that the relationship was volatile and that he threatened to shoot [Ms. Austria] with his gun. [Petitioner] alleges that during closing argument, the State improperly commented: "Past performance or actions is the best indicator of future performance and actions. That's why you were told about the domestic violence." While [Petitioner] concedes that counsel did move for a mistrial upon this comment, [Petitioner] alleges counsel failed to argue that the collateral crime evidence became a feature of the trial. [Petitioner] contends that the error rose to the necessary level of prejudice as set forth by *Strickland*.

First, the Court would point out that counsel did indeed make this exact argument (i.e. that the collateral crime evidence became a feature of the trial) in a motion for new trial. The trial court denied the motion. Therefore, counsel cannot be deemed deficient for failing to raise an argument counsel did in fact raise.

Second, the Court has reviewed the entire trial transcript (and without submitting all fourteen volumes as an exhibit hereto) and again does not find that the collateral crime evidence became a feature of the trial. Out of the State's twenty witnesses, only two discussed the collateral crime evidence. Ms. Miller's testimony was extremely brief (regarding the Facebook [M]essage), as was Michael Baute's (regarding the text

messages). Out of the six defense witnesses, only [Petitioner] testified regarding the collateral crime evidence. The remaining witnesses testified about the night of the incident, matters relating to the firearm, the crime scene, and [Ms. Austria's] fatal wound. [Petitioner's] allegation that the jury repeatedly heard evidence that he physically abused [Ms. Austria], that he was possessive, that the relationship was volatile, and that he had previously threatened to shoot [Ms. Austria] is an inaccurate statement of the evidence presented. The Court finds this ground to be refuted by the record, and that counsel was not deficient. Accordingly, this ground is denied.

Dkt. 9-2 at 1973–74 (cleaned up) (internal citations omitted).

Upon a thorough review of the record, the Court finds that this ruling involves neither an unreasonable determination of the facts nor an unreasonable application of law. Ground VII is meritless. As the postconviction court noted—and as Petitioner concedes—counsel did raise the issue of collateral crime evidence becoming a feature of the trial. Counsel, moreover, cannot be labeled deficient for causing a problem that never existed. Under Florida law, "[c]ollateral crime evidence becomes an impermissible feature of the trial when inquiry into the crimes transcends the bounds of relevancy to the charge being tried and when the prosecution devolves from development of facts pertinent to the main issue . . . into an assault on the character of the defendant." *Durousseau v. State*, 55 So. 3d 543, 551 (Fla. 2010) (cleaned up) (citation and internal quotations omitted). Of twenty-six witnesses, three discussed collateral crime evidence at Petitioner's trial. One of those three was Petitioner himself. And, while the State did comment on collateral crime issues in closing (to rebut Petitioner's sole defense), counsel objected to it. The

postconviction court therefore correctly found that collateral crime evidence did not become a feature of the trial and that counsel was not deficient. Petitioner is entitled to no relief on this claim.

## VIII. Ground VIII

In Ground VIII, Petitioner argues that counsel was ineffective for failing to seek a limiting instruction after each presentation of collateral crime evidence. Dkt. 1 at 47. Petitioner raised this argument in his motion for postconviction relief, Dkt. 9-2 at 1947, and the state postconviction court denied it. *Id.* at 1975–76. The state appellate court affirmed without opinion. *See Richardson*, 308 So. 3d 608 at *1.

In considering this claim, the postconviction court found the following:

> [Petitioner] alleges counsel was ineffective for failing to seek a limiting instruction after each presentation of collateral crime evidence in order to curtail the unduly prejudicial effect of the evidence. [Petitioner] alleges that had counsel requested such instruction each time, the trial court would have been required to give it. [Petitioner] alleges that failure to request such instruction was especially prejudicial in light of the State's propensity argument referenced in Ground [VII]. [Petitioner] contends that counsel's failure to minimize the damaging effect of this prejudicial testimony undermined confidence in the proceeding.

> As discussed elsewhere in this order, the collateral crime evidence was presented during the testimony of two out of twenty-six total witnesses, as well as was discussed during [Petitioner's] testimony. Further, as discussed elsewhere in this order, the collateral crime evidence was presented only briefly through these two State witnesses. The Court did instruct the jury prior to closing arguments that: "The evidence which has been admitted to show other crimes, wrongs or acts allegedly committed by the defendant will be considered by you only as that evidence relates to proof of motive, opportunity, intent, preparation, plan, knowledge, identity, the absence of mistake or accident. However,

the defendant cannot be convicted for a crime, wrong or act that is not included in the indictment." In light of their brief testimonies and the instruction given prior to start of closing arguments, the Court finds that instructing the jury two additional times, i.e., during Ms. Miller's and Mr. Baute's testimonies, would have had no effect on the outcome of the trial. In other words, even if counsel were deficient for failing to request the limiting instruction the two times the collateral crime was presented during trial, [Petitioner] suffered no prejudice from this failure. It was clear that the evidence was presented to demonstrate the absence of mistake or accident and, in combination with the remaining evidence presented, the Court finds [Petitioner] unable to demonstrate prejudice. Ground [VIII] is denied.

Dkt. 9-2 at 1975–76 (cleaned up) (internal citations omitted).

The Court agrees. If a petitioner fails to establish either of the *Strickland* prongs, his claim fails. *See Maharaj*, 432 F.3d at 1319. Here, the postconviction court reasonably found that Petitioner failed to demonstrate any prejudice (the Court finds it highly unlikely that the postconviction court would have found any deficiency had it considered the deficiency prong in combination with the prejudice prong). Indeed, there is little to no probability that two additional limiting instructions, given in the middle of trial, would have changed anything. The jury was properly instructed as to the limited value of the presented collateral crime evidence prior to deliberations. *See* Dkt. 9-2 at 2182 (the trial court instructing the jury that evidence of other crimes, wrongs, or bad acts "will be considered by you only as that evidence relates to proof of motive, opportunity, intent, preparation, plan, knowledge, identity, the absence of mistake, or accident"). Jurors are presumed to have followed the instructions given to them by trial courts. *Richardson v. Marsh*,

481 U.S. 200, 206 (1987) (describing the "assumption of the law that jurors follow their instructions" as "almost invariable"). Because Petitioner has demonstrated no reason to depart from this assumption to find prejudice, he is entitled to no relief on Ground VIII.

## IX.   Ground IX

In Ground IX, Petitioner argues that counsel was ineffective for failing to elicit testimony from Petitioner that he previously had an unintentional shooting when he lived in Virginia. Dkt. 1 at 49. Petitioner raised this argument in his motion for postconviction relief, Dkt. 9-2 at 1953, and the state postconviction court denied it. *Id.* at 1977–78. The state appellate court affirmed without opinion. *See Richardson*, 308 So. 3d 608 at *1.

In ruling on this claim, the postconviction court found the following:

[Petitioner] alleges his counsel was ineffective for failing to elicit testimony from [Petitioner] that he previously had an unintentional shooting when he lived in Virginia Beach, Virginia and for failing to investigate the matter.[1] [Petitioner] alleges that he informed counsel of this previous unintentional discharge but that counsel failed to ask about it, nor did counsel investigate the matter. [Petitioner] alleges that the prior unintentional discharge occurred while he was cleaning the gun. [Petitioner] contends that had the jury heard such testimony, it would have cast doubt on [his] guilt.

The Court finds that even if counsel could be considered deficient for failing to elicit such testimony, [Petitioner] was not prejudiced. Initially, the Court notes that while [Petitioner] refers to this prior shooting as an unintentional shooting, he indicates that it occurred

---

[1] Petitioner has not raised any failure to investigate claim in his instant Petition.

while he was cleaning his gun, which would perhaps more aptly be considered an accidental discharge. The Chief of the Military Police testified that he was aware of accidental discharges but was not aware of any unintentional discharges. [Petitioner] does not allege that he had been drinking at the time the gun went off when he was cleaning it; thus, his defense of intoxication affecting his motor skills would not have been supported by the prior accidental shooting during the cleaning of the gun. Moreover, it could have been more prejudicial than helpful. Specifically, [Petitioner] has had prior "unintentional" or "accidental" discharges, yet still chooses to carry and handle a firearm while intoxicated, would likely not have painted an innocent picture in the jury's eyes.

Additionally, [Petitioner] was living in Virginia Beach prior to his MP training. The Chief of Military Police training explained the extensive training [Petitioner] received with respect to firearms. [Petitioner's] firearm training including teaching him to never put his finger on the trigger unless he has identified a target. This is called indexing, where the index finger is placed along the barrel of the gun. The Chief of Military Police explained that [Petitioner] would know how to safely handle a firearm in order to prevent any type of accidental discharge from occurring, including how to correct malfunctions. Notably, the gun in this case was functioning properly. One expert opined that [Petitioner's] training would make it less likely to have an unintentional discharge. The Court finds that the fact that [Petitioner] had a previous accidental, or unintentional, discharge while cleaning his gun prior to his extensive MP training and expert rating would have had no bearing on the outcome of the case where he was not cleaning his gun but was handling it normally and while intoxicated. Having failed to demonstrate prejudice, this ground is denied.

Dkt. 9-2 at 1977–78 (cleaned up) (internal citations omitted).

Once again, the Court agrees with the postconviction court. As a preliminary matter, the Court notes that "[a]n ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword." *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1324 (11th Cir. 2013)

38

(citation and internal quotations omitted). The postconviction court clearly explained why evidence of a prior unintentional shooting represents a double-edged sword for Petitioner: it paints the picture of a reckless person who has, at the very least, failed to learn from his mistakes even after receiving military training. Counsel cannot be deemed ineffective for failing to elicit testimony concerning this incident. There are few, if any, reasonable attorneys who would.

For the reasons explained by the postconviction court, Petitioner cannot demonstrate prejudice either. Beyond the fact that the alleged circumstances surrounding Petitioner's first accidental discharge are wholly distinct from those surrounding the discharge that led to Ms. Austria's death, the first discharge took place prior to Petitioner's military training. It is therefore difficult to decern any relevancy in the purported testimony Petitioner now wishes to have given. Petitioner was not prejudiced by counsel's decision not to elicit testimony on this subject. In this Court's opinion, he was benefited. Petitioner is entitled to no relief on this claim.

## X.     Ground X

In Ground X, Petitioner argues that counsel was ineffective for failing to object and/or failing to move for a mistrial due to improper comments in closing arguments. Dkt. 1 at 51. Petitioner raised this argument in his motion for postconviction relief, Dkt. 9-2 at 1954, and the state postconviction court denied it.

*Id.* at 1978–79. The state appellate court affirmed without opinion. *See Richardson*, 308 So. 3d 608 at *1.

The postconviction court denied this claim for the following reasons:

[Petitioner] alleges his counsel was ineffective for failing to object and/or for failing to move for a mistrial when the State made improper comments during closing argument. Specifically, [Petitioner] points to the State's comment on [Petitioner's] exercise of his right to trial and failure to take responsibility: "[Petitioner] did not get on the stand and confess to the crimes. I don't think you just expect him to do so, because, if he was going to, we wouldn't need a trial. We wouldn't be here. So the fact that he took the stand should have no input [to] you other than to judge his testimony, and you get to judge his testimony like anyone else. . . . The fact that he didn't admit it doesn't mean he's not guilty. If it was, every defendant would take the stand and say, 'I didn't do it,' and they'd all go home, not guilty. We know that doesn't happen." Additionally, [Petitioner] points to the State's alleged misstatement of the law: "No matter how much they told you he had been drinking, no matter how much they told you they want to show how intoxicated he was, that doesn't mean anything when it comes to first-degree murder or second-degree murder. Those aren't issues. Voluntary intoxication is not a defense, so you have to take that out." [Petitioner] alleges that counsel should have objected and moved for a mistrial after these two improper comments and rose to the necessary level of prejudice in *Strickland*.

The Court finds that this claim is without merit. As to the first statement [Petitioner] takes issue with, the entire context is the prosecutor rebutting the closing statement of defense counsel with respect to [Petitioner's] testimony. The State was merely reminding the jury that they should judge [Petitioner's] testimony the same as everyone else who testified; on which the trial court also instructed the jury. The Court does not find this to be an improper comment on [Petitioner's] right to a trial; thus, counsel was not deficient for failing to object here.

As to the second statement [Petitioner] takes issue with, again, the entire context does not indicate that this comment was improper or a misstatement of the law. Voluntary intoxication is not a defense to those

crimes. Voluntary intoxication was being used by the defense to demonstrate that [Petitioner's] motor skills were impaired, not that he could not form the intent necessary for those crimes. There was not a misstatement of the law here. Accordingly, the Court finds that counsel was not deficient for failing to object to this statement. Therefore, Ground [X] is denied.

Dkt. 9-2 at 1978–79 (cleaned up) (internal citations omitted).

This finding involved neither an unreasonable determination of the facts nor a misapplication of clearly established federal law. In addressing this claim, it is important to reiterate that, in the absence of clearly unreasonable factfinding, the Court's "inquiry is limited to whether the state court unreasonably applied a holding of the Supreme Court." *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287 (11th Cir. 2012). This is important here because "the Supreme Court has never held that a prosecutor's closing arguments were so unfair as to violate the right of a defendant to due process."[2] *Id.* Thus, just as in *Reese*, Petitioner is not entitled to federal habeas relief simply because it cannot be "an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by the Supreme Court." *Id.* (internal quotations omitted) (citing *Mirzayance*, 556 U.S. 111 at 122, 129). Petitioner's conclusory argument that the postconviction court's determination of the facts was unreasonable cannot change this conclusion. The postconviction court clearly

---

[2] Such a finding would be required here to demonstrate prejudice under *Strickland*.

reviewed the record in detail and properly applied the facts to its analysis. Petitioner, moreover, "never identifies what facts the state court incorrectly construed or overlooked." *Id.* at 1290. Given this, the Court cannot reverse the postconviction court's ruling on Ground X. Petitioner is entitled to no relief.

## XI.    Ground XI

Finally, in Ground XI, Petitioner argues that the cumulative effect of counsel's acts and omissions collectively resulted in sufficient prejudice to warrant a new trial. Dkt. 1 at 55. Petitioner raised this argument in his motion for postconviction relief, Dkt. 9-2 at 1958, and the state postconviction court denied it. *Id.* at 1979. The state appellate court affirmed without opinion. *See Richardson*, 308 So. 3d 608 at *1.

In considering this claim, the postconviction court found the following:

[Petitioner] alleges the cumulative effect of counsel's errors deprived him of the right to a fair trial and his right to effective assistance of counsel. "Where the alleged errors urged for consideration in a cumulative error analysis are individually 'either procedurally barred or without merit, the claim of cumulative error also necessarily fails.'" *Israel v. State*, 985 So. 2d 510, 520 (Fla. 2008) (quoting *Parker v. State*, 904 So. 2d 370, 380 (Fla. 2005)); see also *Lukehart v. State*, 70 So. 3d 503, 524 (Fla. 2011) (holding the finding of only one error was not sufficient to support a claim of cumulative error). All the grounds presented in [Petitioner's] motion have been denied; therefore, Ground [XI] is denied.

Dkt. 9-2 at 1979 (cleaned up).

The postconviction court's analysis of Ground XI is equally applicable here. Having denied all of Petitioner's claims and having found only one possible error,

the Court cannot grant Petitioner any relief based on cumulative error. There was no cumulative error. Ground XI is denied.

## XII.   Evidentiary Hearing and Certificate of Appealability

In light of the foregoing analysis, an evidentiary hearing in this matter is unnecessary. "A petitioner is entitled to an evidentiary hearing if he alleges facts that, if true, would entitle him to relief." *Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014) (internal quotations and citations omitted). Notwithstanding, "a district court is not required to hold an evidentiary hearing where the petitioner's allegations are affirmatively contradicted by the record, or the claims are patently frivolous[.]" *Aron v. United States*, 291 F.3d 708, 715 (11th Cir. 2002) (citation omitted). Here, Petitioner's claims are almost entirely meritless or contradicted by the record. As a result, summary dismissal is appropriate. *See Broadwater v. United States*, 292 F.3d 1302, 1303 (11th Cir. 2002) (finding that "a district court faced with a § 2255 motion may make an order for its summary dismissal [i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief").

Petitioner is also not entitled to a certificate of appealability ("COA"). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant[,]" and if a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. §

2253(c)(2)." Rule 11(a), Rules Governing Section 2254 Proceedings for the United States District Courts; *see Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). To merit a COA, Petitioner must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Eagle*, 279 F.3d at 935. Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Petitioner is not entitled to either a COA or leave to appeal *in forma pauperis*.

Petitioner got a fair trial. He testified that he shot the victim in the head accidently. The jury did not believe him. A certificate of appealability is denied. Leave to appeal *in forma pauperis* is denied. Petitioner must obtain permission from the circuit court to appeal *in forma pauperis*.

### CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) Petitioner's Petition for Writ of Habeas Corpus (Dkt. 1) is **DENIED**.

(2) A certificate of appealability and leave to appeal *in forma pauperis* is **DENIED**.

(3) The Clerk is directed to enter judgment in favor of Respondent and close this case.

**DONE AND ORDERED** at Tampa, Florida, on July 31, 2023.

*/s/ William F. Jung*

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record